THOMPSON BROOKS, Appellant, *v.* ZACHARIAH BRUYN, Appellee.

APPEAL FROM WARREN.

To constitute possession of land there must be some unequivocal act of ownership upon it; which may be otherwise than by enclosing it with a fence.

The intention or *animus* of a party as connected with his action indicating ownership of land, is a question for the jury; and where it appears that such acts of ownership are in good faith, with the design exclusively to appropriate the land, a verdict will not be disturbed, especially when it is a fourth one on the same question.

This is an action of forcible entry and detainer, instituted upon the following complaint before a justice of the peace:

" STATE OF ILLINOIS, WARREN COUNTY, ss. ·

" Zachariah Bruyn, being duly sworn, deposes and says, that he is now lawfully entitled to the possession of north-west quarter of section nine (9), in township nine (9) north, in range two (2) west, in Warren county, in the State of Illinois, and that he was and has been lawfully entitled to the possession of said land ever since the 26th day of June, A. D. 1856. That on or about the second of July, A. D. 1856, he, said Bruyn, was in the actual possession of said land, claiming to be seized in fee thereof. That on said day, when he, said Bruyn, was in the actual possession of the said land, one Thompson Brooks made an entry on said land, when entry was not given to him, said Brooks, by law. That said Brooks continued in possession of said land, and continues in possession of said land, and now detains, forcibly and wrongfully, and ever since said day of said entry has forcibly and wrongfully detained said land from the possession of the said Bruyn, your affiant. Your affiant further states, that the said Thompson Brooks entered on said land wrongfully on or about said second day of July, A. D. 1856, and without right, and kept the said affiant, Z. Bruyn, from regaining possession of said land, and now withholds, and ever since said entry, has withheld possession of the said defendant. Your affiant further avers, that the said Brooks was not, at the time of said entry, lawfully entitled to the possession of said premises. Your affiant further states, that on the day of the date hereof, he did, by his agent and attorney, George F. Harding, make a demand in writing for the possession of said premises from said Brooks, and that said Brooks altogether refused to give up possession of the said premises.

" Sworn to and subscribed before me, this 10th day of September, A. D. 1856."

A verdict and judgment was rendered for the plaintiff, from which this appeal is taken, and the following errors assigned:

That the Circuit Court erred in admitting improper evidence offered by the plaintiff.

That the Circuit Court erred in excluding proper evidence offered by the defendant.

That the Circuit Court misdirected the jury by giving improper instructions on the part of the plaintiff.

That the Circuit Court erred in refusing to instruct the jury as asked by defendant.

That the Circuit Court erred in overruling defendant's motion for a new trial, and in rendering judgment for the plaintiff.

That the Circuit Court erred in not rendering judgment for the defendant.

That the Circuit Court erred in rendering said judgment, because the same is against the law and the evidence.

The evidence of prior possession of the land by the plaintiff, was in substance as follows:

*Nathaniel Bruyn* testified, that he was the father of the plaintiff, and that he knew the land in controversy. First became acquainted with it six or seven years ago. It is rolling prairie land, having a creek running through it, with stone and coal on it. The first act of improvement was done by witness in September, 1855, at which time he put a rail pen on the land; that on the 26th day of September he hauled a load of rails fifteen miles on said land, and laid them up into a square pen, with a floor, on the corner of the quarter near the house of Joshua Coates, with his assistance, and that on the next day, September 27th, he hauled another load of rails on to said land and threw them off in a pile with the others, but does not recollect whether they were laid up by him or not. He hauled the rails there and built the pen to take possession of the land, and for Coates to put corn in to feed his hogs. That at the time he hauled the rails on said land, he claimed the land under a special warrantee deed from David Crawford to him, dated June 25th, 1852, which was exhibited and read to the jury. That at the time he hauled the rails on to the land, he leased the same to Joshua Coates, and executed to Coates the following lease: " Roseville, Sept. 27, 1855. I this day agree to let Joshua Coates have the north-west of section quarter 9, 9 north, 2 west, 4th principal meridian, for the term of one year, for the sum of one dollar cash in advance, the receipt whereof I acknowledge to have received."

Plaintiff then offered and read in evidence a deed from Nathaniel Bruyn to Zachariah Bruyn for the land, dated June 26th, 1856, and recorded April 2nd, 1857. The witness further testified, that nothing more was done on the land from September 26th, 1855, until the last day of June, 1856, when the plaintiff took five yoke of oxen and a prairie-plow from the house of witness to the land; that he went with plaintiff, and that they broke four furrows around the entire quarter, part of the way, and three furrows the balance, and laid off three or four lands for breaking; at that time he saw that about one acre had been broken on the south side, near the centre of the quarter; had no knowledge before, that any breaking had been done; that after having marked out from forty to sixty acres for breaking, that day, he returned home, leaving the plaintiff breaking, and returned there again with the plaintiff on the

2nd of July following; that the plaintiff remained on the land until the 1st of July, when he returned to the house of witness, and that they started to return to the land in the evening of the 1st of July, and reached the land about 11 o'clock at night; that they took with them two loads of lumber, and left the wagons and the lumber standing on the land all night; the next morning at sunrise, plaintiff and witness commenced building a shanty, 16 × 8, and plaintiff went to building a yard to keep the oxen in; on coming from breakfast, plaintiff brought his bed and carpet-bag, and put in the shanty; finished shanty and yard about noon; about 10 or 11 o'clock in the forenoon, ten or eleven men came on another part of the land, with several wagons and teams loaded with logs; the men laid up the logs for a stable, but put no roof on; some breaking had been done on the land we had laid out, from the time witness left there on Monday, to the time he returned on Tuesday night. After the 2nd July, and before this suit was commenced, plaintiff broke from forty to sixty acres, all that was laid out, and built a dwelling-house, 16 × 24—a framed house, which he commenced the 1st of July. The plaintiff occupied the shanty until his house was finished, and then moved into it. On his cross-examination, witness stated that at the time he hauled the rails on the land, the lines of the land had not been run off; did not go back there from the time he hauled the rails there until June, 1856; when he went back, he staid until the middle of the afternoon, and then he saw a little patch of breaking on the land. The lumber that was hauled down belonged to witness; saw people at work on the land on the same day that we commenced the shanty on the land; did it to take possession; the furrows run around the land included the rail pen; Coates owned the land on the south side; some of the rails were on the land, when he went back in June, 1856.

*Patrick Clark* testifies to the same effect, and that plaintiff forbid them coming on the land with the logs—that Coates replied, they were doing it for Brooks, he (Brooks) not being present.

*John S. Chandler* testified, that he had known the land since the fall of 1855; he knew the house moved on the quarter in controversy, on the 2nd of July, 1856; before it was moved, the house stood near the line between the quarter occupied by Brooks and Coates, each having one-half. Cincinnatus Memford lived in the house before, and when it was moved on the land in controversy; that he had seen Coates take the rails that made the pen, spoken of by Bruyn, off the land, in the winter of 1856, and afterwards hauled them back again.

On cross-examination, witness stated that the quarter in controversy was open in the winter of 1855 and 1856, on the west, north and east sides, and was then vacant and unoccupied.

*George Morse* testified, that he was a carpenter, and built dwelling-house on land in controversy for plaintiff; commenced in August, and finished in September, 1856; before this suit was commenced, fifty or sixty acres of prairie were broken by plaintiff while the witness was building said house; after plaintiff had done said breaking, the defendant, with some hands assisting him, came on plaintiff's breaking, and sowed wheat; the plaintiff forbid the defendant seeding, but the defendant disregarded the plaintiff, and continued to sow.

On cross-examination, witness stated that he saw another house on the land, about thirty rods from the place where he built the house for the plaintiff; defendant forbid plaintiff making any further improvements; does not know whether the defendant sowed all the land broken by plaintiff.

*Harrison Jones* testified, that he was acquainted with the land in controversy; that plaintiff slept in shanty on the night of the 2nd of July, 1856, and continued to stay there until he removed into the house built on the land by him; that there was a stone quarry on the land; in the fall of 1855, witness and Coates were quarrying stone there, and Coates said to witness that he would have to charge people something for stone, to get enough to pay for his lease; that he had a lease from Nathaniel Bruyn, which he had agreed to take of the quarter; that he had seen men at work quarrying stone there before that time.

The defendant objected to the evidence of witness as to the quarrying of stone, and the statements of Coates, but the court overruled the objection, and allowed the evidence to go to the jury, and defendant excepted.

On cross-examination, witness stated that he did not pay anything for stone, and that the land was vacant and open prairie.

*Joel Franklin* testified, that he knew the stone quarry on the land in controversy, in October, 1855; saw Coates and Jones quarrying stone there; Coates spoke of others getting stone there, and said he would have to charge something for stone, so as to get enough to pay for his lease, as he had leased the land from Bruyn, and asked the witness if he had not seen that pen up there, as Bruyn had put it there to hold possession; and that the land was vacant and unoccupied.

The defendant objected to all the evidence of this witness, but the court overruled the objection, and the defendant excepted.

*Jackson Smith* testified, that he knew the land, and saw the rail pen in the fall of 1855, or spring of 1856. It was seven or eight rails high, and looked as if feeding had been done around it. The pen was three or four rods from the road. There was no other improvement on the land except the pen.

*Martin Jones* testified, that he knew the land in controversy, and that he saw the defendant sow wheat in September, 1856, on the east part of the breaking done by plaintiff; that he saw the defendant breaking prairie on the quarter, in the afternoon of the 2nd of July, 1856.

*Cincinnatus Memford* testified, that he knew the land in controversy, and that he assisted in moving a house and log stable upon the land on the 2nd of July, 1856. Saw defendant, on the 25th of June, 1856, with one Richard Ray, break about two acres on the land in controversy. That defendant did nothing on the land from that time until the morning of the 2nd of July, when Coates came to the house of witness and woke him up—said that plaintiff was on the land and was building a house, and asked the witness to notify some of the neighbors, when witness and the neighbors went on said land with logs to build a stable with. The plaintiff was then building on the land, and he forbid them going on. The defendant was not there until the stable was put up; he came about noon, and that about noon of the same day defendant bought of Coates the house that witness then lived in, and the house was moved on the land in controversy in the afternoon ; that he continued to occupy said house with his family after it was moved on the land ; that he supposed he was still the tenant of Coates. The next day after the house was moved on, defendant came and built a yard around the house. At the time the defendant broke the land on the 25th of June, either the rails or the pen built on the land by Nathaniel Bruyn were on the land ; does not recollect whether the rails were laid up or not. The defendant knew of the lease of Nathaniel Bruyn to Coates as early as the fall of 1855 ; have heard him and defendant talk about it.

On cross-examination, the witness stated that the lease he referred to, commenced in the fall of 1855, and was for one year. He had frequently seen it in the hands of Coates. [Here the lease of Nathaniel Bruyn to Coates was handed to witness, and proven by him as the identical lease he had seen in Coates' possession. The lease was then offered in evidence, and read to the jury.] The witness stated that he thought the rails placed on the land by Nathaniel Bruyn were loose. On the 25th day of June, A. D. 1856, Coates made the request to go and move the stable on the land. Coates said they were at work for defendant. On the last day of June, plaintiff ploughed three or four furrows ;

that the land was vacant and unoccupied (except the rails) when the defendant made his breaking on the 25th of June. Plaintiff was at work building his shanty before the logs were taken by Coates and others, to build a stable for defendant.

On re-examination, witness stated that there was no breaking done on the land by the defendant during the year 1856, except what was done on the 25th day of June, and no other act of improvement except moving the stable and house on 2nd of July, and building fence; knew men to go on the land and get stone; witness had got coal there while he was tenant of Coates —that the land was unoccupied when defendant did his breaking, except the rails—no roof put on the log stable.

*Joel L. Chandler*, being re-called, testified that defendant told him there was a man breaking up prairie on the land in controversy, and that he (defendant) did not want it done, because he wanted the land for pasture. No fence was built on the land until the spring of 1857, except the yards around the houses.

*Nathaniel Bruyn*, being re-called, testified that after the lease was signed and delivered by him to Coates, on the 27th of September, 1855, it was agreed between them that the plaintiff or witness could go on the land any time and make further improvements, and Coates was to board the hands while at work; an agreement was made in 1854, after plaintiff was 21 years old, between him and myself, by which the witness agreed to let plaintiff have a quarter section of land, if he would remain and work for the witness until his farm was open and improved. No particular quarter was at the time mentioned. Plaintiff agreed to do so, and worked for the witness for about two years —until his farm was improved. In winter or spring of 1856, as early as March, witness agreed to let plaintiff have the quarter in controversy; he was to go on early in the spring, but was prevented; that no deed was made to plaintiff by witness until 26th of June, 1856, when deed was made in pursuance of previous agreement; that at the time he put the rail pen on the land, in 1855, he claimed title as owner of the land, by deed from David Crawford, dated June 25th, 1852.

The defendant objected to all the evidence of this witness, but the court overruled the objection and allowed the evidence to go to the jury, and defendant excepted.

The plaintiff then offered to prove the payment of all the taxes assessed on the land for 1840, 1841, 1842, 1843, 1844, 1845, 1846, 1847, and 1848, by George W. Berrian, and for 1849, 1850, 1851, by D. Crawford, and for 1852, 1853, 1854, 1855, by N. Bruyn. The defendant objected to such evidence, and the court sustained the objection, and plaintiff excepted.

Witness, on his cross-examination, stated, that the first day he hauled the rails he laid them up in a pen, and the next day he went and wrote the papers—he wrote one, and Coates wrote the other; that he did not go back again until he went with his son on the last day of June, 1856. The defendant admitted that demand had been made in writing for the premises before the commencement of this suit, and thereupon rested.

The defendant, to show that his possession was prior in time to the plaintiff's, and that the illegal entry, if any, was by the plaintiff upon him, read in evidence a deed for the land from one J. H. Baker to him, dated December 24th, 1855, and recorded Jan. 1, 1856, and called *Richard Ray*, who testified, that he worked for defendant in the summer of 1856, and ploughed corn for him in June; that on the 25th of June, witness and defendant went on the land and ploughed about two acres. Did not then see any improvement on the land, and does not think there was any. The defendant at that time told him he wanted to break the land so as to put in fall wheat. Thinks that defendant told him he desired to fence and improve the land. The stable was put on the land in the forenoon, and the house in the afternoon of the 2nd of July, 1856. They were put on for defendant.

This witness, on his cross-examination, stated that no breaking had been done on the land before or after that time, at that season. Defendant said, he wanted to do the breaking to take possession of the land, and if he could, he wanted to fence and sow wheat for the purpose of taking possession. Defendant helped move the house on, but Coates " bossed the job."

It was omitted to state, that *William Clayton* testified for the plaintiff, that he was laying out a road on the west line of the land in controversy, in May, 1856; that there was a bad place about the middle of said quarter on the west line; that he asked the defendant if they might build a bridge east of the line on this quarter, and defendant replied that he could not give any permission, as the west half of the quarter belonged to Joshua Coates, and that since then he had another conversation with the defendant, and he said that Coates was to have half of the land, and that he had no title for it, or nothing to show for it; and further said, that if he lost the land, of course Coates would not get his half.

To all the evidence of this witness the defendant objected; but the court overruled the objection, and allowed the evidence to go to the jury, and defendant excepted.

The deed from plaintiff to Harding, made in 1858, and a reconveyance from Harding to Bruyn, in 1859, for this tract of land, are of no importance in the case.

H. M. AND J. J. WEAD, for Appellant.

W. C. GOUDY, for Appellee.

BREESE, J.    When this case was before this court at a for-
mer term, *Brooks* v. *Bruyn*, 18 Ill. R. 542, we then said that
actual possession of land may arise in different ways, as by
entering upon and improving the same, with the intention of
appropriating the land to an ordinary or useful purpose, which
acts, in their nature, in connection with the claim of right,
indicate an exclusive use and control of the property ; by erect-
ing buildings ; by breaking prairie for cultivation ; by inclosure ;
by opening shafts for raising coal or ore, quarries for obtaining
rock, and using them to the exclusion of others ; by the use
and control of timber land belonging to a farm or homestead,
although disconnected therewith, for the ordinary supply of
wood or timber for such farm or homestead, as in *Davis* v. *Easley
et al.*, 13 Ill. R. 198.    To constitute possession, there must be
some unequivocal act of ownership on the land itself, but it is by
no means necessary that the land should be inclosed by a fence.
That idea has been long since exploded.    Even to defeat an
adverse title, it is not necessary.    The erection of a fence is
nothing more than an act presumptive of an intention to assert
an ownership and possession over the property.    But there are
many other acts which are equally evincive of such an inten-
tion, such as entering upon land and making improvements
thereon, raising a crop, which may be done without a fence,
felling and selling the trees thereon under color of title.
*Meredith* v. *Pearl*, 10 Peters, 413.

As a general rule, any act done, evincing to the neighborhood
in which it is situate, that the land is appropriated to indi-
vidual use, is sufficient.    The possession will then be deemed
co-extensive with the title under which the party doing the act
claims.    *Dills* v. *Hubbard*, 21 Ill. R. 328.

The intention with which such acts, whatever they may be, are
done, is exclusively for the jury, and though this court held in
this case, as reported in 18 Ill. R., *supra*, that doing some use-
less thing on the land, as erecting a pen, sham building, leaving
a few rails or timbers, with the intention thereby of excluding
others, and not of permanently improving and using the land,
would not amount to actual possession, yet when to such acts are
superadded others, manifesting an intention to cultivate and use
the land, an actual possession could be maintained.

The other acts, as found in this case now, are, running three
or four furrows entirely around the land—laying out strips for
ploughing " lands " — erecting a dwelling-house upon it, and

breaking and inclosing forty or more acres.  These acts were submitted to the jury, to determine, from them, the *animus* with which the plaintiff entered upon the land, and we think, are acts of possession not equivocal, and so the jury have found.

The facts show, it is true, that appellant, on the 25th June, 1856, broke about one acre of this land, but did nothing further evincing an intention to improve it, until the 2nd of July following, when his neighbor, and tenant of this land, seeing plaintiff erecting his shanty upon it, went, in the absence of appellant, and roused the neighbors, and with their assistance moved an old roofless stable from the land he occupied, on to this land, and on the same day, in the afternoon, the house occupied by Memford, with his family in it, mounting it on wheels, and placing it on the disputed property.   The *animus* of all the acts of these parties was a proper matter for the consideration of the jury, and they have found, by their verdict, that they were not done for the purpose and with the intention of using and improving the land, but rather to anticipate and exclude the plaintiff.   The evidence is quite sufficient to show, that plaintiff, before these acts done by appellant, was in the actual possession of the land, with the *bona fide* intention of appropriating it to his own use, and that intention consummated, by breaking forty or more acres of the land, inclosing it with a fence, and building a house upon it.   And the acts done by both parties were finally left to the jury, under proper instructions from the court, and as it is the fourth verdict, as alleged and not denied, that the appellee has obtained against the defendant, and no glaring errors perceived in the rulings of the court, we do not feel disposed to disturb the verdict.   "It is for the interest of the State that an end should be put to litigation," and four verdicts ought to have this effect.

The justice of the case seems clearly with the appellee, and if there be some errors in the record, we do not deem them sufficient to justify our interference.   The judgment must be affirmed.

*Judgment affirmed.*